# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 4, 2011

## STATE OF TENNESSEE v. DEMETURUS ALEXANDER[1]

**Direct Appeal from the Criminal Court for Shelby County**
**No. 10-01045     John T. Fowlkes, Jr., Judge**

---

**No. W2010-02675-CCA-R3-CD  - Filed January 6, 2012**

---

The defendant, Demeturus Alexander, was convicted of aggravated robbery, a Class B felony, by a Shelby County Criminal Court jury and sentenced to ten years in the Department of Correction.  On appeal, he challenges the sufficiency of the convicting evidence.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Stephen C. Bush, District Public Defender; and Harry E. Sayle, III (on appeal) and Dianne M. Thackery (at trial), Assistant Public Defenders, for the appellant, Demeturus Alexander.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Senior Counsel; Amy P. Weirich, District Attorney General; and Garland Erguden and Glenda Adams, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This cases arises out of the robbery of the victim, Stephen Moorman, a Domino's Pizza delivery driver, at gunpoint on July 10, 2009.  As a result, the defendant was indicted on one count of aggravated robbery.

---

[1]The indictment lists the defendant's name as "Demeturus McClain, also known as Demeturus Alexander."  The defendant filed a motion to amend or redact the indictment to eliminate the name of Demeturus McClain, which the trial court granted.

The State's first witness at trial was the victim, who testified that he was working as a delivery driver for the Domino's Pizza on Union Avenue in Memphis on July 10, 2009, when he was called to make a delivery to 308 Pontotoc Avenue close to midnight. As he was driving to the address, approaching some one-story apartments down the side of that street, two young men outside the apartments started waving him down. He called the phone number on the delivery ticket to make sure the two men were the ones who ordered the food. One of the men answered the phone, and the victim told him that he had their food. The men approached the victim's car, and the victim rolled down his window to inform them of the total.

The victim testified that he was able to get a good look at both of the men and described one as "shorter, light complected, [with] a white headband on, short hair. He had a white like a basketball jersey on, white baggie shorts." The other man was "slim, taller, darker complected and he had [a] dark shirt on and dark shorts." He identified the defendant as one of the men – the taller, "five ten or so," darker-complected man.

The victim testified that, when he handed them the ticket and asked for money, the defendant put a gun to his head through the partially rolled down window. The victim reiterated that the gun was held against his head and that the defendant was the one holding the gun. The defendant told him to get out of the car, but the door was locked, the engine was running, and he decided he "wasn't getting out of the car." The victim raised his arms, and one of the men grabbed the cell phone out of his hand. The defendant's companion then hit him on the shoulder with a stun gun, stinging him and causing him to jump. As he jumped, the defendant's companion stung him again. The victim raised his arms and then saw sparks everywhere. The victim assumed that the stun gun hit the metal on his car door.

The victim testified that the two men backed up, so he "hit [the] gas and took off." As he drove away, the victim had his head down so the men would not shoot at the back of his car. He turned right on the first street he reached, Third Street, then drove onto Linden Avenue. Once on Linden, the victim saw a "PST officer" standing on Beale Street, so he pulled up and told the officer what had happened. The PST officer called the police, who went to see if the two men were still in the area.

The victim testified that the gun the defendant held to his head was "very small, like a [.]22," and was a revolver. The victim stated that he "was scared to death" when the gun was being held to his head and that the stun gun "hurt a lot." He noted that the stun gun made one side of his body numb for a day, with pain lasting for a week.

The victim testified that, on the Sunday following the Friday night event, Sergeant White with the Memphis Police Department called him to the police station to view a photographic array of six pictures. The victim looked at the array and picked out the defendant. He was sure of his identification. The victim circled the defendant's picture on the array and wrote that "this is the person that had the gun when I was robbed." The victim was also shown a second array to see if he could identify the defendant's companion that night, but the victim was unable to identify anyone in the second array. After he viewed the photographic arrays, an officer showed him a cell phone that had been recovered, which the victim identified as his own.

Detective Jonas Holguin with the Memphis Police Department testified that, on July 11, 2009, he was called to assist in investigating the robbery in this case and was instructed to go to 3377 Guernsey Avenue. As Detective Holguin and five other officers were walking up to the house at that address, they were met by a woman who gave them consent to search her home. Detective Holguin searched the back area of the residence, where he found the defendant sitting on a bed. He asked the defendant to stand up and, when the defendant did, Detective Holguin observed a cell phone on the bed, "sticking out from where the pillow was." He asked the defendant to whom the cell phone belonged, and the defendant responded that it was his. However, the defendant could not provide Detective Holguin with the phone number for the phone. Detective Holguin dialed the victim's phone number, and the cell phone sitting next to the defendant rang. The defendant was then placed under arrest. Detective Holguin explained that the victim's cell phone provider had been able to pinpoint the location of the victim's phone to an approximate area that encompassed only the residence they searched.

Lieutenant Kedzie White with the Memphis Police Department testified that he was the lead investigator in the present case. Lieutenant White first came into contact with the defendant on July 11, 2009, after he had been placed under arrest. The defendant was advised of, and signed a form regarding, his Miranda rights. The officers conducted an oral interview of the defendant but did not reduce it to writing because the defendant "was giving [them] information that [they] knew was wrong or false" from their investigation.

Lieutenant White testified that, after the defendant was in custody, he had the victim view a photographic array, from which the victim identified the defendant. The officers took the victim's statement and then arranged for a second visit with the defendant. After being advised of his rights again, the defendant gave a statement to the officers. Lieutenant White recalled that the defendant's original story had been that he bought the victim's cell phone from a person named "Kee-Kee" around 8:30 p.m. the night of the incident. He also told the officers that he knew the phone had been taken in a robbery of a pizza delivery driver. However, when the defendant was later confronted with the facts the police had obtained

from the victim and the circumstances they had learned regarding the case, the defendant "recanted his original version of the story and modified it to place himself on the scene but not as an active participant." Lieutenant White recalled that the defendant

> advised that he and a group of individuals were walking from the Foote Homes and they hatched this idea to rob the pizza delivery guy. And that it was his idea to do so . . . and to pick the location where it occurred because he knew that the delivery drivers had made deliveries at that location before and he knew that they wouldn't come to the location where they had started.

In his written statement, the defendant admitted that he helped plan the robbery. He said that he, Deangelo, and two other men walked to Pontotoc Avenue with the plan "to get some money off the pizza man." The defendant did not admit to having a gun and claimed that he "was just sitting there" when Deangelo and another man approached the delivery driver. He stated that he "took off running" when Deangelo "upped a gun." He admitted to receiving the phone stolen in the robbery.

After the conclusion of the proof, the jury convicted the defendant of aggravated robbery as charged in the indictment.

## ANALYSIS

### Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing that there was insufficient proof of his identity as the man who robbed the victim at gunpoint. He acknowledges that the proof could support a conviction for facilitation based on, as asserted in his statement to police, that he "suggested a place for the pizza delivery," or theft of property less than $500 because he "obtained the cell phone with the knowledge that it was obtained in a robbery."

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

We conclude that the evidence, when viewed in the light most favorable to the State, was sufficient to establish the defendant's identity as one of the robbers. The identification of a defendant as the perpetrator of a crime is a question of fact for the trier of fact to determine from the evidence presented at trial. See State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). The identification testimony of the victim is sufficient, alone, to support a conviction. Id. The victim testified that he was shown a photographic array of six individuals from which he identified the defendant as "the person that had the gun when [he] was robbed." He said that he was sure of his identification. The victim also identified the defendant in court. The jury, as was its prerogative, accredited the victim's identification of the defendant. Moreover, the jury chose, also as its prerogative, to discredit the defendant's assertion that he was only guilty of "suggest[ing] a place for the pizza delivery" and receiving the stolen property. The evidence was sufficient to support the defendant's conviction.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial

court.

_____
ALAN E. GLENN, JUDGE